UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X
                                                                 :
THE BASU GROUP INC.,                                             :
                                                                 :
                              Plaintiff,                         :        Civil Action No.
                                                                 :        16-cv-00461-PGG
                v.                                               :
                                                                 :
SEVENTH AVENUE, INC.                                             :        <u>JURY DEMANDED</u>
                                                                 :
                              Defendant.                         :
-----------------------------------------------------------------X


**DEFENDANT'S CUMULATIVE APPENDIX IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**PAGES 212-259**

# In the Matter Of:

## THE BASU GROUP vs SEVENTH AVENUE

16-cv-00461-PGG

---

# PAULA LUDWIG

*November 18, 2016*

---

*Confidential*



Def. Qumul. App'x 212

800.211.DEPO (3376)
EsquireSolutions.com

```
                    *** CONFIDENTIAL ***
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   _____x
                                :
 3                              :
     THE BASU GROUP, INC.,      :
 4                              :
             Plaintiff,         :      Civil Action No.:
 5                              :      16-cv-00461-PGG
                                :      ECF CASE
 6           vs.                :
                                :
 7   SEVENTH AVENUE, INC.,      :
                                :
 8           Defendant.         :
     _____x
 9

10

11

12   _____

13

14            Deposition of PAULA LUDWIG

15            Friday, November 18, 2016

16                  10:15 a.m.

17                     At

18         Seventh Avenue, Inc.
           1112 7th Avenue
19         Monroe, Wisconsin  53566

20

21

22

23   Reported by Sheila K. Fairchild

24

25
```



```
 1            DEPOSITION of PAULA LUDWIG, a witness in the

 2    above-entitled action, was taken at the instance of the

 3    Plaintiff, under and pursuant to the Rule 30 (b) (6),

 4    Federal Rules of Civil Procedure, pursuant to notice,

 5    before me, SHEILA K. FAIRCHILD, Professional Court

 6    Reporter and Notary Public, in and for the State of

 7    Wisconsin, at the offices of Seventh Avenue, Inc., 1112

 8    7th Avenue, Monroe, Wisconsin, on the 18th day of

 9    November, 2016, commencing at 10:15 a.m. and concluding

10    at 2:10 p.m.

11

12

13    APPEARANCES:

14    MYERS WOLIN, LLC

15         MICHAEL R. GILMAN

16         100 Headquarters Plaza

17         Morristown, New Jersey  07960

18         Appeared on behalf of the Plaintiff.

19

20    LADAS & PARKY, LLP

21         DAVID C. BREZINA

22         224 South Michigan Avenue, Suite 1600

23         Chicago, Illinois  60604

24         Appeared on behalf of the Defendant.

25
```

**Def. Cumul. App'x 214**

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

```
 1   COLONY BRANDS ASSOCIATE GENERAL COUNSEL

 2        TIMOTHY ENGLING

 3        1112 7th Avenue

 4        Monroe, Wisconsin  53566-1364

 5        appeared on behalf of the Defendant.

 6

 7   ALSO PRESENT: Russell Davis, President Seventh Avenue,

 8   Inc.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



**Def. Cumul. App'x 215**

```
 1  |                         INDEX

 2  |

 3  |   Examination by:                              Page

 4  |   Mr. Gilman                                      6

 5  |   Mr. Brezina                                     71

 6  |
    |   (The original transcript was sent to Attorney Gilman.)
 7  |

 8  |

 9  |                       EXHIBITS

10  |   No.                                           Page

11  |   P1    Complaint                                 11
    |   P2    Red peacock handbag                       12
12  |   P3    Deposition Notice                         15
    |   P4    Defendant's Initial Disclosures           17
13  |   P5    Plaintiff's First Set of Interrogatories  18
    |   P6    Defendant's Response to Interrogatories    19
14  |   P7    7th Avenue Privacy Policy                 21
    |   P8    SA000355 to 367 e-mail and photos         32
15  |   P9    SA000368 to 379 e-mail and photos         32
    |   P10   SA000380 to 384 e-mail and photos         32
16  |   P11   SA000385 e-mail chain                     34
    |   P12   SA000396 to 400 e-mail chain and photos   34
17  |   P13   SA000387 to 395 e-mail chain and photos   34
    |   P14   SA000407 to 408 e-mail chain              34
18  |   P15   SA000409 to 412 e-mail chain and photos   39
    |   P16   SA000413 to 416 e-mail chain and photos   39
19  |   P17   SA000425 to 426 e-mail and photos         48
    |   P18   SA000427 to 428 e-mail and photos         48
20  |   P19   SA000429 e-mail                           48
    |   P20   SA000434 to 450 and 430 to 433 e-mail chain
21  |         quote sheets and detail sheets            48
    |   P21   SA000472 to 495 e-mail chain and photos   48
22  |   P22   SA000452 to 456 e-mail chain, offer sheet
    |         and quotation                             48
23  |   P23   SA000476 to 478 e-mail chain              48
    |   P24   SA000479 to 483 e-mail, quote sheets
24  |         and detail sheets                         48
    |   P25   SA000549 to 551 e-mail chain              59
25  |   P26   SA000040 to 42 and 698 to 699 wire transfer
    |         request and e-mail chain                  63
```

Def. Cumul. App'x 216

```
 1   P27   SA000001 to 2 and 114 to 115 Purchase order
           and purchase order appendix                    63
 2   P28   SA000577 to 583 e-mail chain and
           redacted sheets                                 63
 3   P29   SA000164, 207, 211, 214, 226, 275, 277,
           278, 281 and 284 redacted sheets                67
 4   P30   SA000345 to 354 drawings                        68
     P31   SA001140, 1150 to 1151 Midnight Velvet catalog
 5         pages                                           68
     P32   SA001146 to 1148 Midnight Velvet catalog
 6         pages                                           68
     P33   SA001209 peacock feather photo                  70
 7
 8   (The original exhibits were attached to the original
 9   transcript with the exception of Exhibit P2, which was
10   retained by Mr. Gilman.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1          TRANSCRIPT OF PROCEEDINGS

2          PAULA LUDWIG, called as a witness herein,

3     having been first duly sworn on oath, was examined and

4     testified as follows:

5                          EXAMINATION

6     BY MR. GILMAN:

7  Q.  Good morning.

8  A.  Good morning.

9  Q.  Please state your full name and spell it for the

10     record.

11  A.  Paula Ludwig, P-A-U-L-A, L-U-D-W-I-G.

12  Q.  Thank you.  Your residence address?

13  A.  1220 North 2nd Street, Monroe, Wisconsin 53566.

14  Q.  Have you ever been deposed before?

15  A.  No.

16  Q.  Go through my little blurp here.  I trust your counsel

17     has explained to you basically what is going to go on

18     today, but I'll just give you a brief overview.  So

19     today's deposition you were sworn to tell the truth.

20     Even though we're not in a court and this is really

21     informal, that has all the same rules regarding perjury

22     and your obligations to tell the truth, etc.  Do you

23     understand?

24  A.  Yes.

25  Q.  A written record is being prepared by the

**Def. Cumul. App'x 218**

```
 1        stenographer.  Unless she's asked to stop, she's going
 2        to attempt to take down everything that you say and
 3        that I say and your counsel may say.  For clarity then,
 4        I promise to try not to speak when you're speaking, and
 5        hopefully you will try not to speak when I'm speaking
 6        because if all three of us are talking at the same
 7        time, it is very difficult to get an accurate record.
 8        If you don't understand a question at any point, just
 9        stop me and let me know, and I'll try to rephrase it.
10        It's not an endurance test.  If at any point you need
11        to take a break, go to the bathroom or just to stretch
12        your legs, let me know, and I'll try to get to a spot
13        where we can break, okay?
14   A.   Okay.
15   Q.   Also, at times your attorney may explain to you that he
16        may object, and that's fine.  Don't be offended by
17        that, and I won't be offended by that.  He's supposed
18        to be doing that.  We'll let him put his objection on
19        the record.  Then I'm going to expect afterwards that
20        you answer the question.  If you need me to repeat it,
21        of course, I'll do that.  The only time you don't
22        answer a question is if your counsel specifically
23        directs you not to answer the question.  Then he and I
24        will have a fight, probably.  Do you have any questions
25        about what I've said so far?
```

1   A.   No.

2   Q.   Great.  Is there any reason that you can think of right

3        now today why you do not believe you would be able to

4        accurately and truthfully answer questions?

5   A.   No.

6   Q.   No medication or nothing?

7   A.   Correct.

8   Q.   I don't mean to offend, but have you ever been

9        convicted of a crime?

10  A.   No.

11  Q.   Have you ever been sued?

12  A.   No.

13  Q.   As you can see, those are background questions.  Has

14       any company you have ever worked for been sued and you

15       have represented them?

16  A.   I don't know what you mean by represented--

17  Q.   In a deposition?

18  A.   No.

19  Q.   Are you currently employed?

20  A.   Yes.

21  Q.   Can you state where you're employed?

22  A.   Colony Brands, Inc.

23  Q.   Their location, the address?

24  A.   1112 7th Avenue, Monroe, Wisconsin 53566.

25  Q.   We'll get into this a little bit more also, but since



**Def. Cumul. App'x 220**

```
 1        you mentioned Colony Brand is your employer and not 7th

 2        Avenue, can you explain the 7th Avenue connection here?

 3                (Off the record.)

 4        BY MR. GILMAN:

 5   Q.   We'll get into this later, but since you mentioned

 6        you're employed by Colony Brand and not 7th Avenue, can

 7        you explain the 7th Avenue connection here?

 8   A.   No, I'm not-- I don't know the legal setup or--

 9   Q.   But you don't work for 7th Avenue?

10   A.   I don't know how the Colony Brand and 7th Avenue-- I

11        don't know how to explain the relationship.  I'm an

12        employee here.

13   Q.   We'll get into that a little bit more later.  Do you

14        have a title at Colony?

15   A.   Yes.

16   Q.   Can you state it for the record?

17   A.   Senior sourcing coordinator.

18   Q.   And what are your responsibilities as a senior sourcing

19        coordinator?

20   A.   I work on product development for our merchandisers.

21        They're looking for product to place in our catalog and

22        internet sites.

23   Q.   Give me-- when you say merchandiser, what do you mean

24        by that?

25   A.   A merchandiser is an employee who's responsible for a
```

**Def. Cumul. App'x 221**

```
 1        particular category of items, for example, jewelry or
 2        apparel, and based on their responsibility, they'll
 3        come to me looking for that type of category, that type
 4        of product in their category.
 5   Q.   And you would direct them in what way?
 6   A.   I receive the information of what they want to source.
 7        I would then go and try to find to source it and
 8        present them with options, and they would ultimately
 9        choose what products they would like to place.
10   Q.   I understand better.  Thank you.  How long have you
11        been with-- at that position?
12   A.   Since 2007.
13   Q.   What were you before that?
14   A.   Before that, I worked for our direct sales company,
15        Swiss Colony Occasions, and before that, I was an
16        assistant in the merchandising department for the vice
17        president.
18   Q.   Did you meet with anyone before the deposition in
19        preparation for it today?
20   A.   Yes.
21   Q.   How many times?
22   A.   Once.
23   Q.   And where did that occur?
24   A.   In Monroe.
25   Q.   And how long did it last?
```



Def. Cumul. App'x 222

```
 1   A.   Approximately three hours.

 2              (Exhibit No. P1 was marked for

 3        identification.)

 4        BY MR. GILMAN:

 5   Q.   Let me show you what has now been marked as Plaintiff's

 6        Exhibit 1, P1.  Have you ever seen this document before

 7        today?

 8   A.   No.

 9   Q.   So could you identify it for the record, or are you

10        unable?

11   A.   It appears to be a complaint from the Basu Group to--

12        versus 7th Avenue.

13   Q.   Does 7th Avenue sell goods all over the United States?

14   A.   Yes.

15   Q.   Does 7th Avenue sell goods into the state of New York?

16   A.   Yes.

17   Q.   Does 7th Avenue sell goods into New York city?

18   A.   Yes.

19   Q.   How does 7th Avenue sell its goods into these areas?

20        Meaning do you have brick and mortar stores?  Is it

21        catalog?  Is it website? Is it a combination of those?

22   A.   Catalog and website.

23   Q.   No brick and mortar stores?

24   A.   Correct.

25   Q.   Has it ever had a brick and mortar store?
```



Def. Cumul. App'x 223

```
 1   A.   I do not know.
 2   Q.   If you would turn in that Exhibit P1 to Exhibit A,
 3        which is, I guess starts at Page 8.  One more sheet.
 4        Have you ever seen this document before?  It's three
 5        pages long.
 6   A.   I've seen Page 3.
 7   Q.   Okay.  Under what circumstances have you seen Page 3?
 8   A.   It was presented to me yesterday.
 9   Q.   So yesterday was the first time you ever saw it?
10   A.   Yes.
11   Q.   Are you familiar-- if you keep turning with the
12        document that's Exhibit B, the complaint of P1?
13   A.   This is a snapshot of our 7th Avenue website.
14   Q.   And to your knowledge, is-- well, is the peacock
15        feathers that are on this bag the subject of today's
16        deposition and the lawsuit?
17   A.   Yes.
18   Q.   Just out of curiosity, I only have P1--
19                (Off the record.)
20                (Exhibit No. P2 was marked for
21        identification.)
22        BY MR. GILMAN:
23   Q.   Show you what's been marked P2.  You can take it out
24        and look through it.  Is this the bag that is shown in
25        Exhibit B of P1?
```



Def. Cumul. App'x 224

```
 1  A.   Yes.
 2  Q.   Okay.  That's all I want.  Actually, look inside of
 3       this.  Can you look on the inside of this bag, please?
 4       Does it have a label for one of the Colony Brands
 5       companies?
 6  A.   Yes.
 7  Q.   And which company?
 8  A.   Midnight Velvet.
 9  Q.   Midnight Velvet.  So this is being sold in a 7th Avenue
10       catalog?
11                MR. BREZINA:  Objection, not in evidence.
12                THE WITNESS:  Shall I answer?
13                MR. BREZINA:  It's sold on the 7th Avenue
14       website, it's not printed in the 7th Avenue catalog.
15       BY MR. GILMAN:
16  Q.   Okay.  So those can be crossover?
17  A.   Correct.
18  Q.   Were you involved in 7th Avenue's acquisition of the
19       bag of Exhibit B for the company?
20  A.   Yes, for Midnight Velvet, yes.
21  Q.   For Midnight Velvet?
22  A.   Yes.
23  Q.   Can you explain your involvement, just roughly the
24       steps of what you went through?
25  A.   Sure.  The agent from India who we work with provided
```



Def. Cumul. App'x 225

PAULA LUDWIG  Confidential                    November 18, 2016
THE BASU GROUP vs SEVENTH AVENUE                           14

```
 1        some designs, hand painted handbag designs which I

 2        shared with the merchant, and she chose this design,

 3        and we put it on a different body of handbag.

 4   Q.   Who chose this design?

 5   A.   The merchant.

 6   Q.   Who was the merchant?

 7   A.   Tisha Barrett.

 8   Q.   Who has-- in the hierarchy of putting something in a

 9        catalog, who makes that decision?  Is it the merchant

10        or you?

11   A.   I do not make that decision.  I do not know if the

12        merchant has sole discretion to make that decision or

13        if she has to have approval through her supervisors.

14   Q.   But it's not you, then?

15   A.   Correct.

16   Q.   And were you involved at all with the sale of this bag

17        by Midnight Velvet or 7th avenue, meaning creating the

18        ads that go on the website or creating the pages that

19        go in the catalog?

20   A.   No.

21   Q.   So that's not your area?

22   A.   No.

23   Q.   Whose area is that, is that the merchants?

24   A.   That would be the creative department area.

25   Q.   Working with who at the company?
```



1   A.   I don't understand.  I don't know how that relationship

2        works or how that's handled.

3   Q.   But you have the relationship with the agent?

4   A.   Correct.

5   Q.   That's you, that's not the merchant?

6   A.   Correct.

7   Q.   Is the agent-- this is a sales agent.  Is the sales

8        agent someone who works for Colony Brands?

9   A.   No.

10  Q.   When I say works for, I don't mean salaried employees.

11       Who are they agents for?  Who do they represent?

12  A.   They represent the vendors or the factories.

13  Q.   Okay.  So they represent the vendors or the factories,

14       they don't represent 7th Avenue or Colony Brands?

15  A.   Correct.

16  Q.   Okay.  So I'm done with 1.

17                 (Exhibit No. P3 was marked for

18       identification.)

19       BY MR. GILMAN:

20  Q.   Show you what's been marked P3.  Have you ever seen

21       this document before today?

22  A.   No.

23  Q.   Can you identify it for the record?

24  A.   A deposition notice to 7th Avenue.

25  Q.   Okay.  Can you please, if you turn to the sixth page of



**Def. Cumul. App'x 227**

1    prayer, sprinkle with water, make sure they're

2    authentic.

3              (Exhibit No. P6 was marked for

4    identification.)

5    BY MR. GILMAN:

6  Q.  Let me show you what has now been marked as P6.  Have

7      you ever seen this document before?

8  A.  No.

9  Q.  Can you identify it for the record?

10 A.  Defendant 7th Avenue's response to Plaintiff's first

11     set of interrogatories and document requests.

12 Q.  And have you ever seen any drafts of this document

13     before?

14 A.  No.

15 Q.  Were you ever-- were you part of the preparation of any

16     of the answers in this document?

17 A.  No.  I guess I don't know what the answers are in this

18     document.

19 Q.  Okay.

20 A.  I don't know if these answers came from documents that

21     I had produced previously to our Legal, I do not know.

22 Q.  All right.  Can you describe 7th Avenue's business for

23     the record?

24 A.  Describe it how?

25 Q.  What it does.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

```
 1   A.   It's a catalog company and offers product to customers

 2        through mail order catalogues and offers those same

 3        products on the website.

 4   Q.   Now, can you do the same thing for Midnight Velvet?

 5   A.   It's a catalog company that offers product to its

 6        customers through mail order catalogs as well as on

 7        their website.

 8   Q.   What's the difference between those two companies?  I

 9        mean, why have the two of them?

10   A.   I can't answer that.

11   Q.   So there's no quality difference that you know of?

12   A.   Not to my knowledge.

13   Q.   There's no categories for them, this one does more

14        jewelry, they both do exactly the same stuff?

15   A.   I don't know.  I don't read the sales between catalogs

16        to know how much they do in different categories.

17   Q.   Do you know, is it geographic?  Does one have a certain

18        area of the country and another have another area?

19   A.   I don't know specifically, but I would assume we mail

20        to different customers.

21   Q.   Other than-- well, does 7th Avenue have any affiliated

22        companies?

23   A.   I don't know.

24   Q.   Okay.  Let me mark this.

25             (Exhibit No. P7 was marked for
```



**Def. Cumul. App'x 229**

1      identification.)

2      BY MR. GILMAN:

3  Q.  Let me show you what has now been marked as P7.  Have

4      you ever seen this document before today?

5  A.  No, I have not.

6  Q.  Have you ever seen any privacy policy of 7th Avenue or

7      Colony Brands before?

8  A.  No, I have not read any privacy policy before.

9  Q.  We're done with that document.  Turning back now to

10     what was previously marked as P1, before today have you

11     ever-- had you ever heard of the company designated as

12     the Plaintiff, the Basu, B-A-S-U, Group?

13  A.  Yes.

14  Q.  When did you first hear of the Basu Group?

15  A.  It was a few years ago. It happened to be an e-mail

16     from the merchant Tisha Barrett had replied to me when

17     I sent her some feather painted options.  She had

18     replied that she did not want to place any because of

19     something going on with Basu.

20  Q.  Do you recall what year that might have been?

21  A.  Maybe 2012 or 2013.

22  Q.  When-- so-- strike that.  So you approached her with

23     some peacock feather art of some kind, and she said she

24     didn't want to do it?

25  A.  Correct.  I sent her an e-mail with some options, and

1        she declined from pursuing them.

2   Q.   So is Tisha the person who first brought Basu Group to

3        your attention?

4   A.   Correct.  It was just in a one or two line e-mail.

5        That was the extent of it.

6   Q.   Have you ever purchased a product from Basu Group?

7   A.   No.

8   Q.   And do you have any Basu Group products at home or in

9        your office?

10  A.   No.

11  Q.   Do you know of anyone at either 7th Avenue or Midnight

12       Velvet or Colony Brands who has Basu products?

13  A.   I do not know.

14  Q.   Have you ever visited the Basu website?

15  A.   No.

16  Q.   Do you know if anyone else who you work with at 7th

17       Avenue or Midnight Velvet or Colony Brands has ever

18       visited the Basu website?

19  A.   I do not know.

20  Q.   When you were doing your search for documents for this

21       case, did you search for Basu Group as a possible?

22  A.   No.

23  Q.   Were you asked to search for Basu Group as a possible?

24  A.   No.

25  Q.   Have you ever discussed Basu Group with anyone at 7th



**Def. Cumul. App'x 231**

```
 1        Avenue, meaning orally or--

 2   A.   When that e-mail came back from Tisha who was traveling

 3        at the time, it said she wasn't planning to pursue any

 4        of those designs because of an issue going on with

 5        Basu, I assume we would have had a short conversation

 6        about that when she returned to the office just saying

 7        that we had a complaint with them.  But other than

 8        that, everything was confidential and I had no more

 9        knowledge of it.

10   Q.   But that would have only been Tisha that you would have

11        discussed it with?

12   A.   Correct, correct.

13   Q.   Have you ever been in a meeting where Basu Group was

14        mentioned or discussed other than with you and Tisha?

15   A.   Other than yesterday when I saw the complaint, no, I

16        have not.

17   Q.   Have you ever discussed Basu Group with any of the

18        vendors or sales agents-- you call them agents, right?

19   A.   Yes.

20   Q.   Sales agents that you work with?

21   A.   No.

22   Q.   Has any vendor ever raised Basu Group in a discussion

23        with you?

24   A.   No.

25   Q.   Now, unfortunately, I'm going to have relatively the
```



Def. Cumul. App'x 232

1      same set of questions for Basu Group's brand, Anuschka,

2      A-N-U-S-C-H-K-A.  Before today, had you ever heard of

3      the brand Anuschka?

4  A.  No.

5  Q.  Did you know Anuschka was the brand of Basu Group?

6  A.  No.

7  Q.  Have you ever heard anybody who you work with mention

8      Anuschka?

9  A.  No.

10 Q.  Have you ever visited the website, anuschkaleather.com?

11 A.  No.

12 Q.  Can I assume when you were searching for documents

13     Anuschka Leather or Anuschka was not part of your

14     search strategy?

15 A.  Correct.

16 Q.  When you were discussing with Tisha the Basu Group, did

17     you discuss Anuschka?

18 A.  No.

19 Q.  Has the Anuschka name ever come up with a vendor or a

20     sales agent?

21 A.  No.

22 Q.  How does 7th Avenue, Colony Brands, Midnight Velvet,

23     all of them, how do you all find goods that you sell?

24          MR. BREZINA:  Objection to form.

25          MR. GILMAN:   The one I'm doing now or the



Def. Cumul. App'x 233

```
 1        one before?
 2               MR. BREZINA:  It's compound, the one now.
 3        BY MR. GILMAN:
 4   Q.   How does 7th Avenue find its goods it sells through its
 5        catalogues and website?
 6   A.   Specifically, my role is I'm in the global sourcing
 7        office, so they come to me with product development
 8        ideas, and I go out and source and look for those
 9        ideas, or with the agents and vendors that I do work
10        with in other countries, they bring to me their designs
11        and goods, and I offer those to the merchants.
12   Q.   So the "they" in that statement is the merchandisers?
13   A.   Correct.
14   Q.   So in-- when this bag was being-- the bag of P2 was
15        going to be in the beginning stages, a merchandiser
16        came to you and asked you for a peacock design
17        specifically?
18   A.   No.
19   Q.   So how did that all arise?
20   A.   The agent that we work with in India offered to us
21        various hand-painted genuine leather handbags and sent
22        over a period of time many different designs, and I
23        shared those with Tisha.
24   Q.   I'm actually going to mark those and ask you questions
25        about them, but those are unsolicited by them?
```



Def. Cumul. App'x 234

1  A.   I mean, memory here, we could have asked to have

2       handbags sent, but typically it's a combination of

3       both.  They give us ideas that they offer as well as

4       something, if we would designate that we would want a

5       geometric print or something, we would also ask for

6       that.  In this case these were just sent to us.

7  Q.   Since it was a compound question before, can you

8       respond as to Midnight Velvet?  Is it the same process

9       for them?

10 A.   As far as how we get products in the catalog?

11 Q.   Yes.

12 A.   Correct, it's the same process.

13 Q.   Does Colony Brands have a separate catalog and website

14      or is that just the parent company?

15 A.   I assume it's the parent company.

16 Q.   So there's no separate catalog?

17 A.   Correct.

18 Q.   So Colony Brands, you don't go out looking for product

19      for any Colony Brands specifically named catalog or

20      website?

21 A.   Correct.

22 Q.   To your knowledge, has 7th Avenue ever sent one of its

23      vendors or agents a picture of an item and said we

24      would like something like this?

25 A.   A specific item or--

```
 1   Q.   Specific, you know, shape of a handbag or design that's

 2        on some kind of an item.

 3   A.   Repeat the question.

 4   Q.   Has 7th Avenue ever given a picture of an item to a

 5        vendor and asked the vendor to make that item?

 6   A.   When you say vendor, you mean a merchandiser?

 7   Q.   No.  I assume it would be you.  You're the one who

 8        deals with the--

 9   A.   I don't know how you identify picture. We give sketches

10        and drawings and technical information to have them

11        develop an item when we're developing something.

12   Q.   Have you ever in your position of sourcing these

13        products through your vendors and the vendors sales

14        agents, have you ever sent an actual picture of another

15        company's product and said we really like this one?

16   A.   I've not done that.

17   Q.   Do you know if anybody else?

18   A.   I would not know.

19   Q.   Are there more people at 7th Avenue that do the same

20        kind of job that you do?

21   A.   I'm in the global sourcing office, so I source certain

22        categories.  There are eight of us here that also

23        source other categories, but the merchants also source

24        through domestic suppliers outside of our office, so

25        there are many people.
```



**Def. Cumul. App'x 236**

1   Q.   What are your categories of sourcing?

2   A.   Apparel, linens and textiles, accessories and foot

3        wear.

4   Q.   Accessories?

5   A.   Would be handbags.

6   Q.   So none of the other-- forgot your title.

7   A.   Sourcing coordinator.

8   Q.   The other sourcing coordinators do any of those

9        categories?  There's no overlay?

10  A.   Those are my categories.  I have people under me that

11       work for linens and textiles, footwear and so forth. I

12       don't source those products for the whole entire

13       company.

14  Q.   Which companies do you source for?

15  A.   The merchandisers also source on their own and through

16       other agents and vendors.

17  Q.   So then a merchandiser would only come to you if

18       they're stuck and they don't have someone?

19  A.   Not necessarily.  The vendors that I work with can't

20       provide every type of category that our catalogues

21       offer, so they come to me with categories that I can

22       offer.  They go elsewhere for the categories that I

23       cannot.

24  Q.   And when you said they go elsewhere, they go directly

25       themselves to these vendors, or do they go direct to--



Def. Cumul. App'x 237

 1  A.   Correct, they go direct to the vendors.

 2  Q.   Okay. Have you ever heard of Shankar, S-H-A-N-K-A-R,

 3       Produce Co, PBT, period, Ltd., period?

 4  A.   Yes.

 5  Q.   Have you ever heard of Anusha, A-N-U-S-H-A,

 6       Merchandising?

 7  A.   Correct.

 8  Q.   Have you ever heard of Manju, M-A-N-J-U-- I'm going to

 9       say--

10  A.   Mittal.

11  Q.   M-I-T-T-A-L?

12  A.   Yes.

13  Q.   Is that a him or her?

14  A.   She.

15  Q.   Have you ever heard of Anurag, A-N-U-R-A-G, Chokhany,

16       C-H-O-K-H-A-N-Y?

17  A.   No.

18  Q.   To your knowledge, what is Shankar Produce?

19  A.   The factory that we're purchasing the red peacock

20       handbag from.

21  Q.   And what is Anusha Merchandising?

22  A.   That's the name of the agency that brought the handbags

23       to us, to offer them to us.

24  Q.   Did you ever deal directly with Shankar Produce?

25  A.   No.



Def. Cumul. App'x 238

```
1    Q.   So your dealings with Shankar were totally through

2         Anusha Merchandising?

3    A.   Correct.

4    Q.   Who is Manju Mittal?

5    A.   She's the owner of Anusha Merchandising.

6    Q.   Have you ever met Manju Mittal in person?

7    A.   No.

8    Q.   So you've never met him face to face?

9    A.   No.

10   Q.   Do you know if she has ever been in the United States?

11   A.   I do not know.

12   Q.   Do you know-- again, I'll ask, do you know who Anurag

13        Chokhany is?

14   A.   No.

15   Q.   I assume you have never met him?

16   A.   I don't know who the person is.

17   Q.   Has Shanker Produce ever approached 7th Avenue offering

18        to show goods for sale to 7th Avenue directly?

19   A.   Not to my knowledge.

20   Q.   And 7th Avenue has never approached Shankar Produce

21        directly looking to sell goods-- I mean to purchase

22        goods?

23   A.   The purchase order is cut to Shankar because they're

24        the factory.

25   Q.   So once that connection is made, it's just the purchase
```



**Def. Cumul. App'x 239**

1       order?

2   A.  Correct.

3   Q.  Before that, before the purchase order, to your

4       knowledge, has 7th Avenue ever approached them at the

5       beginning of a project?

6   A.  Not to my knowledge.

7   Q.  So has Anusha Merchandising and/or Ms. Mittal

8       approached 7th Avenue offering the sale of goods?

9   A.  Yes.

10  Q.  This happens often?

11  A.  Yes.

12  Q.  Have you ever reached out to-- has 7th Avenue reached

13      out to Anusha Merchandising or Ms. Mittal looking to

14      purchase goods?

15  A.  Yes.

16  Q.  So you have solicited her as opposed to her just coming

17      to you first?

18  A.  Correct.

19  Q.  Okay.  Now I want to mark--

20              (Exhibit No. P8, P9 and P10 were marked for

21      identification.)

22      BY MR. GILMAN:

23  Q.  Start looking through those.  Have you ever seen these

24      documents before?

25              MR. BREZINA:  Objection, the witness is still

1   looking.

2                    MR. GILMAN:  Yeah.  That will be my question

3        when she's done.

4                    THE WITNESS:  Okay.

5        BY MR. GILMAN:

6   Q.   Have you ever seen these documents before?

7   A.   I haven't seen these printed documents, but these are

8        e-mails of mine.

9   Q.   Did you-- were you the one who gathered these e-mails

10       when you were asked for production relating to this red

11       handbag?

12  A.   Yes.  I either would have produced them, or Legal would

13       have found them in my e-mails and procured them

14       electronically.

15                   MR. BREZINA:  Do you want to put it on the

16       record or shall I?  Because I have the originals, put

17       the Bates numbers of them?

18                   MR. GILMAN:  I guess I can do that.  P10

19       begins with SA000380.  P9 begins with SA000368. P8

20       begins with SA00355.

21       BY MR. GILMAN:

22  Q.   Is the person who these e-mails are from the Manju

23       Mittal that we've been discussing?

24  A.   Yes.

25  Q.   Is the person that it's to, is that you?

```
 1   A.   Yes.

 2   Q.   Who is CC?

 3   A.   That was my assistant at the time, Stephanie

 4        Darendinger.

 5   Q.   She's no longer here?

 6   A.   She's no longer in the global sourcing office.  She's

 7        still with the company.

 8   Q.   Okay.  These e-mails, were they solicited by you, or

 9        were they just sent to you one day by Ms. Mittal?

10   A.   I don't know without having previous e-mails to this. I

11        don't know if I had requested to send.

12   Q.   What were the purpose of these e-mails?

13   A.   Manju sending items that she could offer to us that she

14        would like included in our catalog.

15   Q.   Before this set of e-mails, you had done business with

16        Manju and her company?

17   A.   I assume.  I don't know exactly when we started

18        business with her.

19   Q.   Let's put those aside.

20             (Exhibit Nos. P11 through P14 was marked for

21        identification.)

22   BY MR. GILMAN:

23   Q.   For the record, P11 starts at SAOOO385.  P12 starts at

24        SA000396.  P13 starts at SA000387, and P14 starts at

25        SA000407.  Have you ever seen these documents before?
```



Def. Cumul. App'x 242

```
 1   A.   These are e-mails of mine, yes.
 2   Q.   And did you find these during your search for
 3        production?
 4   A.   I would assume I would have found them, yes.
 5   Q.   Can you explain for the record what these e-mails are
 6        or what's happening in these e-mails?
 7   A.   In September of 2012, Manju Mittal sent handbag options
 8        for consideration in our catalog. I would have shared
 9        that information with the merchant.  She would have
10        looked at the options, and in October of 2012, I
11        designated the handbags that the merchant wanted sent
12        for consideration.
13   Q.   And this merchant is Tisha?
14   A.   Correct.
15   Q.   And there was-- again, I think you previously discussed
16        this.  There was no specific request made to Manju?
17   A.   According to these e-mails, no. I don't know what
18        transpired before these first e-mails came from Manju
19        with the options.
20   Q.   Did you search before in your e-mails to see?
21   A.   Yes.  I would have searched for red peacock handbag or
22        the item number 3378.
23             MR. GILMAN:  Well, I would request, Counsel,
24        to search for not just-- because I don't think it would
25        be a red peacock handbag in the search request, I mean
```

ESQUIRE
DEPOSITION SOLUTIONS

Def. Cumul. App'x 243

 1    prior to those September e-mails that are P8 through

 2    10, there wouldn't be any reference to a red peacock

 3    handbag because it was only in those documents.  So

 4    what I would want to know is did the merchant request

 5    Ms. Ludwig's department to find peacock related goods

 6    or handbags.

 7             MR. BREZINA:  The legal department searched

 8    and used IT to search everybody's records.  Ms. Ludwig

 9    didn't personally do that.  So we-- it was a long

10    arduous process to select anything having to do with

11    peacocks.

12             MR. GILMAN:  So your office did that or the

13    internal legal department here?

14             MR. BREZINA:  A combination of internal legal

15    and IT.

16             MR. GILMAN:  Okay.  Well, I can't ask you

17    questions, okay.

18    BY MR. GILMAN:

19  Q.  Did you complete your explanation what all this was?

20  A.  Yes.

21  Q.  Going through the names on these documents, are there

22    any names on these e-mail chains that are different

23    from the earlier three names?

24             MR. BREZINA:  I'm going to object.  I think

25    that's ambiguous.  Earlier comparing all these

1        e-mails?

2        BY MR. GILMAN:

3   Q.   Are there any names on these e-mail chains that are

4        different from Ms. Ludwig, Manju and Stephanie

5        Darendinger?

6   A.   They all appear to have just those three names.

7   Q.   And on, just for terminology purposes, on P11, you--

8        no, Manju wrote to you on September 12 at 11:18 a.m.?

9              MR. BREZINA:  The witness is still looking

10       for the document.

11       BY MR. GILMAN:

12  Q.   It's a single sheet. What does she say there?  In the

13       September 12 e-mail from Manju to you at 11:18 a.m.,

14       can you put into English what she writes in that

15       e-mail?

16  A.   "Paula, you could consider price range and MOQ similar

17       to previous quote.  Thank you.  Regards, Manju."

18  Q.   And MOQ is?

19  A.   Minimum order quantity.

20  Q.   PRX was pricing or price?

21  A.   Price range, yes.

22  Q.   If you-- now looking at P12, on the second page, it

23       starts the images, there's-- some of them are squared

24       or circled, I guess.

25  A.   Correct.

ESQUIRE
DEPOSITION SOLUTIONS

Def. Cumul. App'x 245

1   Q.   Who would have done that, you or the merchandiser?

2   A.   Tisha, the merchant.

3   Q.   So you sent her this full gamut of pictures and then

4        she circled or squared or X'd the ones that she wanted?

5   A.   Correct.

6   Q.   Is there anything in these documents that say what you

7        ended up ordering, or were these still premature to

8        that?

9   A.   As far as purchase order?

10  Q.   Yeah, what you ended up getting.

11  A.   No.

12  Q.   Let's put those aside.  Actually, I'm sorry, on P13,

13       it's good to look at my notes.  What's special about

14       September of 2012?

15            MR. BREZINA:  Objection.  Are we talking

16       about--

17            MR. GILMAN:  Just in general.

18            MR. BREZINA:  Nothing with this document?

19            MR. GILMAN:  No.

20       BY MR. GILMAN:

21  Q.   In general, is there anything special about September

22       for your company?

23  A.   Not I'm aware of.

24  Q.   So-- okay.  Looking at P13 then, there's a-- three from

25       the back, it's number 3378.  First of all, whose number



Def. Cumul. App'x 246

1          there's a gap between the next correspondence that was

2          produced to me is in the end of September of '13,

3          almost a year later, so I'm just curious, what happened

4          in between?

5     A.   The samples are received.  I make sure they're properly

6          marked with the vendor, the price and the MOQ, and then

7          I hand them off to the merchant.  Typically in our

8          company, the merchants have areas where they accumulate

9          and keep their items and as they work through creating

10         a catalog spread with the other merchandisers, they're

11         reviewing product, pulling it out, trying to tell

12         stories within the spread.  So we have many samples

13         on-site for quite a while that are being considered,

14         and sometimes they're placed quickly and adopted in a

15         catalog, and sometimes they go back to the shelf and

16         they try to work them in when they're trying to tell a

17         different story or season.

18    Q.   So the item that was in P13 that we looked at before,

19         had the number 3378?

20    A.   Yes.

21    Q.   To your knowledge, was that item ever placed in any of

22         your catalogues or on your website?

23    A.   This particular design and shape, no.

24    Q.   Do you know why?

25    A.   No.



Def. Cumul. App'x 247

800.211.DEPO (3376)
EsquireSolutions.com

1   Q.   When you say you had a sample, you mean you actually

2        got a bag?

3   A.   We got this bag.

4   Q.   Do you still have that here?

5   A.   I don't know.

6             MR. GILMAN:  If you could find it.  Sorry,

7        that was directed to Mr. Brezina.

8        BY MR. GILMAN:

9   Q.   I presume the-- on P15, I'm sorry, I'm trying to be as

10       organized as I can.

11  A.   Okay.

12  Q.   I assume that's the Tisha Barrett is the merchandiser

13       we've been discussing?

14  A.   Yes.

15  Q.   And who are the other two names on the CCs?

16  A.   Darcia Nofsinger is my current assistant, and Joe

17       Tomasiewicz is my boss.

18  Q.   Can you explain because on a lot of these e-mails that

19       we'll go through, they don't seem to have dates.  Do

20       you have any understanding of why that is?

21  A.   No, I don't.

22            MR. BREZINA:  Counsel, I believe I have an

23       understanding.  It is the way that they were forwarded,

24       the form that they were forwarded and the way they

25       printed to pdfs.



```
 1        BY MR. GILMAN:

 2   Q.   Okay.  So somewhere there's a date on some of these,

 3        maybe?

 4                MR. BREZINA:  I can double-check if you have

 5        some you want to check.

 6        BY MR. GILMAN:

 7   Q.   Well, I guess my question is on P15, for example, the

 8        e-mail that Tisha was responding to was from September

 9        17, 2013 at 9:30-ish a.m.  There's no date on hers, can

10        I assume it was the 17th or 18th or sometime reasonably

11        close?

12   A.   I don't know what you can assume.

13   Q.   Do you recall-- You were the one in this conversation?

14   A.   Yes.

15   Q.   Do you recall sending these to Tisha and her getting

16        right back to you?

17   A.   This particular e-mail for P15 is actually from Manju,

18        so she was including Tisha on the e-mail to me that

19        came from Manju.  And Tisha's response it shows was

20        sent from a Samsung mobile phone while she was

21        traveling.  So I would assume she did answer rather

22        quickly and she's stating that she's removed Manju.

23   Q.   Oh, you're correct.  I didn't even notice that.  When

24        Manju sent her the first e-mail of this chain, P15, she

25        included as a CC Tisha, which I hadn't even noticed
```

Def. Cumul. App'x 249

ESQUIRE
DEPOSITION SOLUTIONS

```
 1                    MR. GILMAN:  Okay, can we look and see if we
 2          can date these, just out of curiosity?
 3                    MR. BREZINA:  Yeah, we'll see, but like the
 4          mobile phones are saved differently than things from
 5          the server at the company, and there may not be dates.
 6          BY MR. GILMAN:
 7   Q.     From the tone, I mean-- how do I want to phrase this?
 8          So I'm here again in 2013 and there's two e-mails. And
 9          then I think the next set of e-mails I have start in
10          2014, if I'm characterizing your production correctly.
11          So did you ever close this out with Manju?  Are there
12          no e-mails of that?
13                    MR. BREZINA:  This meaning?
14          BY MR. GILMAN:
15   Q.     Relating to Tisha's message about peacock feathers, how
16          was that translated to Manju?  What happened with
17          what's going on in P15 and 16?  What happened between
18          you guys after these e-mails?
19   A.     P16, my answer to Manju is, "Hi, Manju, note that Tisha
20          is out of the office.  She will try to find some
21          feathers or a southwest theme and send to you for
22          inspiration later in the week.  I think she liked
23          colors and flowers of the initial bag she chose but
24          just perhaps wanted to change the feathers, not
25          necessarily peacock feathers as you are showing
```

```
 1   Q.   Do you see the writing index in the designs on SP5 and

 2        the belt?

 3   A.   Yes, there's writing, I see it.

 4   Q.   Do you know what the writing is?

 5   A.   No.

 6   Q.   Just to reference, it's my client's writing on their

 7        bags.  That's the way they sign each one of their

 8        bags.  And the belt is also signed.

 9             MR. BREZINA:  That's not a question

10             MR. GILMAN:  No.  It's a statement of me on

11        the record.

12   BY MR. GILMAN:

13   Q.   Okay.  We can put those aside.

14             (Exhibit Nos. P17 through 24 were marked for

15        identification.)

16   BY MR. GILMAN:

17   Q.   Start perusing those.  Let me give you these.  For the

18        record, P17 starts at SA000425. P18 starts at SA000417.

19        P19 is SA000429. P20 starts at two different places. It

20        starts first at 000434 and then again toward the end,

21        430. P21 starts at SA000472. 22 starts at SA000456. 23

22        starts at SA000476 and P24 starts at SA000479. Have you

23        had a chance to just thumb through them?

24   A.   Yes.

25   Q.   Have you seen these documents before?
```



Def. Cumul. App'x 251

1   A.   Yes.

2   Q.   And they are what?

3   A.   These are e-mails and correspondence between myself and

4        Manju where we notified her that we had picked her

5        peacock design and we wanted to place it on a different

6        style of handbag, also the quote sheets and detail

7        sheets that we need to set the item up in our system so

8        we can set a purchase order.

9   Q.   So progressing through these as general purposes, P17

10       is the e-mail from you to Manju saying that you have

11       picked an item?

12  A.   Correct.

13  Q.   P18 is some continuing correspondence.  Now that's

14       between you and Tisha?

15  A.   Correct.

16  Q.   Regarding price of this bag?

17  A.   Correct.

18  Q.   Okay.  P19 is I guess Tisha's response to you?

19  A.   Correct.

20  Q.   P20 seems to be a chain, and it shows, correct me if

21       I'm wrong, after the opening e-mail of P17 that we

22       discussed, then it shows correspondence between

23       yourself and Manju?

24  A.   Correct.

25  Q.   Is that true also for P21?



**Def. Cumul. App'x 252**

```
 1              MR. BREZINA:  Could we-- could you ask it
 2        more specifically than, "Is that true"?
 3        BY MR. GILMAN:
 4   Q.   Is it continuing correspondence-- is P21 just further
 5        correspondence between yourself and Manju regarding
 6        what was on P20?
 7   A.   Correct.
 8   Q.   Then what is P22 discussing?
 9   A.   So when an item is placed in our catalog, we send our
10        agent in this case a quote sheet to be completed and a
11        detail sheet.  The detail sheet, I thought I saw it in
12        here somewhere--
13   Q.   Is that P20 you have?
14   A.   I'm looking for it.
15   Q.   If that's P20 that you're looking through, if you go
16        right to the third page, fourth page, right after the
17        e-mails.
18   A.   Yes. Thank you.  We're talking about P22, that
19        correspondence started with me, an e-mail to our trade
20        compliance department attaching this detail sheet and a
21        picture of the red peacock handbag, and there's nothing
22        in the body of the e-mail.  It's in the subject line,
23        it says F15013-GA, red peacock feather handbag, looking
24        for duty in return 6724955.  That's just our specific
25        way of asking our global compliance department to
```



**Def. Cumul. App'x 253**

```
1         assign an HTS code and a duty so we can bring it into
2         the country.  They look at this detail sheet that's
3         been completed and submitted to me from Manju--
4    Q.   I'm sorry, is that P20?
5    A.   Correct.  Identifying the leather, the dimensions of
6         the bag, the fill, identifying it as a handbag and that
7         it's for women, and so for P22 then, the trade
8         compliance department sent from Anna Lyvers is telling
9         me what the HTS code and the duty percentage is going
10        to be on this handbag.
11   Q.   What does HTS stand for?
12   A.   Harmonized tariff schedule.
13   Q.   Okay.
14   A.   Then my assistant Darcia responded as noted, "Thank
15        you," in 22.
16   Q.   Okay.
17   A.   Also attached to P22 is our actual quote sheet. It's
18        two tabs, so the first tab which is SA000453 was
19        completed by Manju.  It's identifying the handbag and
20        all of the master case pack information, the care
21        instructions, so forth, who the vendor is. It
22        identifies the handbag by our pack number and tracking
23        number and the price and the minimum order quantity and
24        the expiration date for the price.  The other two tabs
25        of that quote sheet end in 454 and 455, and that's
```

1        identifying Shankar as the vendor and Anusha as the

2        agent.  Again, this is a quote sheet we sent to Manju

3        to fill out.  It identifies the bag is to have a

4        Midnight Velvet label and it's signed and dated and

5        again, has the price expiration on it.

6   Q.   What's the purpose of the pack number that I have seen

7        on a lot of different documents?

8   A.   That's how we identify the item in our internal systems

9        and what is printed in our paper catalog and listed on

10       our internet sites.  That is the order-- the number the

11       customer used to order the handbag.

12  Q.   And the quantity here was going to be 300 pieces; is

13       that true?

14  A.   She's identifying the price and that our minimum order

15       quantity must be 300 pieces.

16  Q.   Okay.  Then what does-- we already discussed P22.

17       What's going on in P23?

18  A.   23 starts off with an e-mail from my assistant to Tisha

19       Barrett and Amy Kroeger, Tisha's assistant just

20       leaving-- explaining that we left the following photo

21       sample with you today, F15013-GA, a red peacock handbag

22       with a pack number.  I don't know why that's-- that's

23       478. Then there are several e-mails within 23 that

24       aren't related.  Document number 477 is an e-mail that

25       Manju sent to me.

**Def. Cumul. App'x 255**

1           some legalities with regard to Cal Prop 65. This

2           document would have been sent to Manju for signature by

3           Shankar.

4    Q.     Is that what the fax cover is of 482?

5    A.     Correct.

6    Q.     So can you now for the record go through with me this

7           whole process of this bag and from these e-mails that

8           we've seen, in your own words, just explain for the

9           record for all of us who don't know this industry what

10          exactly went on?

11   A.     So Manju had sent--

12                  MR. BREZINA:  Do you want her to speak or you

13          want her to--

14          BY MR. GILMAN:

15   Q.     Yeah, just speak.

16   A.     Manju had sent design offers that she wanted me to

17          review with the merchant for consideration in our

18          catalogues.  That was in 2012, 2003.

19   Q.     2013?

20   A.     Or 2013, sorry, 2013.  Tisha identified some styles she

21          would have liked to be sent for consideration.  We did

22          receive them shortly thereafter, and then in December I

23          believe, it was 2015, Tisha came to me and said that

24          she actually was going to place a red peacock handbag

25          but she wanted the design from one of the items Manju

**Def. Cumul. App'x 256**

1   submitted placed on the body of another item that Manju

2   submitted.

3   Q.   I think that was December '14.

4   A.   Okay.

5   Q.   Is that correct?

6   A.   I can look and tell you the exact date if you need me

7        to.

8   Q.   I think it's on 4-- 425.

9   A.   December 18, I notified Manju that we were placing the

10       red peacock feather handbag and needed her to combine

11       two styles together.

12  Q.   And to your knowledge, once all of this takes place and

13       it's agreed to go into the catalog, what's your

14       involvement after that?

15  A.   I send the paper work, the detail sheet and the quote

16       sheet to be completed.  Once I get the HTS code and the

17       duty from the trade compliance group, I add that to the

18       quote, and then I send that to the merchant to do the

19       processing of the quote, and then I follow up until I

20       have a photo sample and hand that off to the merchant,

21       and then my role is done.

22  Q.   Your role is done.  So do you know if it ever gets into

23       the catalog?

24  A.   Typically it goes into the catalog if the merchant

25       tells me that it's been placed and asks me to get a



Def. Cumul. App'x 257

ESQUIRE
DEPOSITION SOLUTIONS

1        photo sample and a quote and a detail sheet.

2   Q.   Do you know-- are you the right person to ask, do you

3        know if this bag was sold by both Midnight Velvet and

4        by 7th Avenue?

5   A.   Well, our items being in specific different brand of

6        our catalogs are also shown on various other websites

7        that we own as well.

8   Q.   My question may be for Russ later.

9   A.   Uh-huh.

10  Q.   7th Avenue is the defendant in this case.  You're

11       producing documents that show, I think there was a 300

12       piece order that was placed.  If you know, was that 300

13       piece order divided between Midnight Velvet and 7th

14       Avenue as far as sales are concerned or--

15  A.   I don't know how sales are attributed back to the

16       various catalog brands.

17  Q.   Do you know if that was the only 300 piece ordered?

18  A.   I do not know, no.

19  Q.   Okay.  In P17--

20  A.   Yes.

21  Q.   So this is referring-- you're referring back to this,

22       when you say this bag was received quite a few seasons

23       back, so please confirm the price.  So Tisha just

24       remembered off-- I mean off the top of her head that

25       there was a bag from 2012 that she liked?



**Def. Cumul. App'x 258**

1  A.   As I explained before, the merchants acquire and

2       accumulate different product that they keep in a

3       special area that's designated to them so it's always

4       visible in front of them, and as they're working

5       catalog spreads for the new season and trying to put a

6       story together, they have access to those items, and go

7       through them and work with them.

8  Q.   Okay.  Then P17 shows that that's the same number 3378

9       which was back from one of the earlier documents we

10      looked at, and if I'm phrasing this incorrectly, please

11      let me know.  So what this e-mail says we like this

12      design of number 3378, but we don't like the shape of

13      the bag.  We like the Sundance bag that's in the

14      picture on the far right.  So can you put it on that

15      bag?

16 A.   Correct.

17 Q.   Okay.  And because the bag was bigger, the price went

18      up, or maybe just two years later?

19 A.   Yeah, I can't answer that, why the price change.

20            (Recess taken.)

21            MR. BREZINA:  Mr. Gilman asked for us to look

22      for the product sample for the original red peacock

23      design, and we want to put on the record that we looked

24      and we don't have it.  As far as we know, it was gone

25      long before the lawsuit was threatened.